CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
September 19, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| June Frye, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Omni Charlottesville Virginia Corporation | ) Civil Action No. 3:24-cv-00015 |
| | ) |
| and | ) |
| | ) |
| Omni Hotels Management Corporation, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff June Frye fell as she attempted to leave a platform in the atrium of the Omni Charlottesville Hotel, sustaining various injuries. She filed this action against Defendants Omni Charlottesville Virginia Corporation ("Omni Charlottesville") and Omni Hotels Management Corporation ("OHMC") alleging negligence in failing to inspect and maintain the premises or failure to warn of the elevation change between the platform and the atrium floor. (*See* Am. Compl. ¶ 14 (Dkt. 58).) This matter is before the court on Defendants' motion for summary judgment (Dkt. 86). For the reasons stated below, the court will grant the motion.

## I. Background

### A. Factual History

The following material facts are taken from the summary judgment record and, unless otherwise stated, are undisputed.

The Omni Charlottesville Hotel ("the Omni"), located in Charlottesville, Virginia, is owned by Omni Charlottesville and operated by OHMC. (Defs.' Mem. at 3 (Dkt. 87); *see* Answer ¶ 2 (Dkt. 68).) The Omni's atrium features a fountain with a "tiered platform area of two platforms with tables and seating for guests." (Defs.' Mem. at 4; Dep. of Collin Smith, Corporate Representative for HITT Contracting, Jan. 28, 2025, at 8:1–8 (Dkt. 88-4).)

Frye first visited the Omni in April 2023, when she stayed for three days and two nights while attending a nearby wedding. (Dep. of June Frye, Aug. 1, 2024, at 124:7–14, 124:23–125:11, 130:5–7 (Dkt. 87-1).) Though she "didn't actually spend a lot of time there" due to wedding events, she walked by the platformed area in the Omni's atrium at least once. (*Id.* at 124:20–21, 135:19–136:5, 139:2–7.) She reports that at the time, the hotel appeared well-maintained and that she did not see anything that posed a safety concern. (*Id.* at 127:20–22, 129:10–13.) The platforms and atrium floor at that time were tiled in matching red brick. (Dep. of Jose Rodriguez, Feb. 12, 2025, at 10:10–13 (Dkt. 88-1).)

The next month, Defendants began renovations on the Omni. (Smith Dep. at 8:18–21.) Though these renovations did not change the structure of the fountain feature or the two platform areas, they did include the retiling of those platforms and the atrium floor. (Rodriguez Dep. at 10:5–15; 53:14–54:2.) HITT Contracting, Inc., a third-party contracting

company, retiled the two seating platforms in black tile, while they tiled the atrium floor in a black-and-white checkerboard pattern with the black squares made from the same black tile as the two platforms. (*Id.* at 10:5–15, 25:20–27:17; Smith Dep. at 5:16–6:1; Dep. of Meagen Dowling, Dec. 5, 2024, at 11:2–13 (Dkt. 87-6).) During the renovation, black-and-yellow safety tape was placed on the edge of the first-tier platform. (Rodriguez Dep. at 20:17–21:13, 41:10–14.) Renovations to the atrium were completed on September 15, 2023. (Smith Dep. at 9:2–5, 9:17–20.) The safety tape was removed from the first-tier platform when construction was complete. (Rodriguez Dep. at 43:3–12, 70:6–9.)

Meanwhile, Frye and three friends planned a trip to Charlottesville in September 2023. (Frye Dep. at 146:15–147:2; Dep. of Beth Anne Potter, Sept. 19, 2024, at 31:22–32:2 (Dkt. 87-4).) The group decided to stay at the Omni for the duration of their visit on Frye's suggestion. (Frye Dep. at 147:8–21, 148:11–17; Potter Dep. at 31:18–21; Dep. of Joan Newman, Sept. 24, 2024, at 19:15–19 (Dkt. 87-10).) Frye and her three friends—Beth Anne Potter, Joan Newman, and June Forehand—ultimately booked a three-night stay at the Omni from September 26 to September 29, 2023. (Frye Dep. at 55:18–25, 149:2–5; Potter Dep. at 24:16–21.)

On September 26, Frye and Potter arrived first at the Omni, having traveled together to Charlottesville. (Frye Dep. at 149:2–14, 150:17–21.) After all four women had arrived and checked in to their rooms, Frye and Potter met downstairs in the lobby and walked over to the atrium for a cocktail before dinner. (*Id.* at 150:17–25, 155:17–23; Potter Dep. at 54:8–19, 56:15–58:8; Newman Dep. at 33:5–17; Dep. of June Forehand, Sept. 19, 2024, at 53:1–5,

53:17–54:19, 64:11–65:2, 66:1–13 (Dkt. 87-9)).) The two first ordered drinks at a temporary bar that had been set up in the atrium. (Potter Dep. at 56:15–58:8.) They next traversed the first-tier platform and settled on the second-tier platform, where they could wait for their drinks on a sofa and chairs. (*Id.* at 66:1–67:12; *see* Forehand Dep. at 64:22–65:6; Def.'s Second Requests at 2–4 (Dkt. 87-11)[1].) Shortly after a server brought their drinks to them on the second-tier platform, Forehand and Newman joined them there. (Forehand Dep. at 64:22–65:2, 65:17–66:18.) Forehand and Newman sat with Frye and Potter for about ten minutes before one or both traveled down from the second-tier platform to the first-tier platform and then the atrium floor to order drinks. (*Id.* at 68:12–22.) After approximately an hour of chatting on the second-tier platform, (Newman Dep. at 45:15–21), the four women returned upstairs to their rooms to exchange gifts and then left the Omni—passing through the atrium on their way—to get dinner at a nearby restaurant, (Frye Dep. at 150:17–25, 165:17–22, 167:2–12).

At some point while on the second-tier platform, Potter warned both Forehand and Newman about the danger of the steps down, although accounts differ as to whether this warning was given while in the presence of Frye. (Forehand Dep. at 69:11–70:20, 71:6–72:7; Newman Dep. at 39:11–24, 49:10–22.) Frye also noticed the step when she observed a woman

---

[1] Defendant Omni Charlottesville served Frye with "Second Requests for Admission and Interrogatories" on October 1, 2024. (*See* Dkt. 87-11.) Frye did not respond. (*See* Defs.' Mem. at 7 n.7.) "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). Because Frye did not respond, the court will treat the matters in the requests as admitted.

who she believed may have just fallen from it, (Frye Dep. at 218:17–219:5; Potter Dep. at 93:1–8), after which the four women discussed the potential fall, (Potter Dep. at 77:20–78:22). However, none of the four had any trouble or otherwise needed assistance negotiating the steps while ascending and descending from the first-tier and second-tier platforms, (Def.'s Second Requests at 2–4; Potter Dep. at 67:13–68:9, 68:21–69:6, 81:1–10, 82:6–10, 83:7–19; Forehand Dep. at 69:1–3, 73:15–17, 76:16–77:1, 80:7–81:21; Newman Dep. at 50:24–51:3, 51:15–23, 53:3–8, 54:7–17), though they "navigated the steps with some trepidation," (Potter Dep. at 85:6–11). Potter also testified to having told the bartender on duty that he "need[ed] to do something about" the step. (*Id.* at 86:1–14.) Frye did not step onto the platforms again that evening, although she passed through the atrium on the way to and from dinner. (Frye Dep. at 165:17–167:5, 169:19–171:6.)

The next morning, Frye met with Potter, Forehand, and Newman in the Omni's lobby, where they decided to stay at the hotel and take advantage of the breakfast buffet set up in the atrium. (Frye Dep. at 178:16–21; Forehand Dep. at 96:22–98:10.) The four women together chose a table located on the first-tier platform when their first-choice seat—a table on the main floor right next to the buffet—was taken before they could reach it. (Frye Dep. at 183:16–184:4, 185:4–11, 188:6–11.) While seated at the table, Omni staff traversed the step from the atrium floor to the first-tier platform multiple times to take the women's orders, serve their food, and deliver the party's bills. (*Id.* at 195:14–196:8, 200:19–21, 210:5–12; Forehand Dep. at 107:20–110:11, 138:3–139:13; Newman Dep. at 66:10–69:11, 71:9–22; Potter Dep. at 104:2–10, 111:1–11.) However, due to the angle of her seat, Frye does not

recall seeing any person navigate the step while the four were eating breakfast. (Frye Dep. at 199:1–6, 201:7–202:13.)

Once the four women had finished eating and settled their bills, they decided to return to their rooms. (Potter Dep. at 120:9–22; Forehand Dep. at 113:2–4.) At that point, around an hour after she had first sat down, Frye stood from the table and attempted to leave the first-tier platform in the direction of the elevators. (Frye Dep. at 220:1–19, 223:4–13; Potter Dep. at 119:8–20; Forehand Dep. at 113:20–114:13.) As she did so, she fell off the first-tier platform and onto the atrium floor. (Frye Dep. at 223:17–20; Potter Dep. at 130:11–20; Forehand Dep. at 114:10–21.) She was not looking for the platform edge and was not thinking about the change in elevation, (Frye Dep. at 223:14–16, 226:15–22, 237:15–22), which "was not visible to [her]" from her perspective on the first-tier platform, (*id.* at 237:7–14, 254:15–255:5). After the fall, Potter and Newman stepped off the first-tier platform without issue to assist Frye as they waited for medical assistance. (*Id.* at 243:10–19; Potter Dep. at 130:17–131:2; Newman Dep. at 79:5–12, 79:20–80:5; Forehand Dep. at 125:7–22.) Frye suffered various injuries as a result of her fall. (Frye Dep. at 243:5–7, 243:20–244:4; Dep. of Vincent Jones, Sept. 24, 2024, at 34:7–12 (Dkt. 88-3).)

**B. Procedural History**

Frye filed a complaint against Omni Charlottesville in Albemarle County Circuit Court on February 23, 2024. (Compl. at 3–5 (Dkt. 1-1); *see* Dkt. 1 at 2.) On March 10, 2024, Defendant Omni Charlottesville timely filed a notice of removal to the U.S. District Court for the Western District of Virginia based on diversity jurisdiction. (*See* Dkt. 1.) The next day,

Omni Charlottesville filed an answer which included affirmative defenses. (Dkt. 4.) On December 6, 2024, Frye filed a motion to join OHMC as a defendant, (Dkt. 22), which the court granted unopposed on January 13, 2025, (Dkt. 27). Frye filed an amended complaint approximately one month later. (Dkt. 58.) Defendants filed an answer on February 24, 2025. (Dkt. 68.)

On March 21, 2025, Defendants filed this motion for summary judgment. (Dkt. 86.) Frye filed a response on April 3, 2025. (Dkt. 88.) Defendants replied one week later. (Dkt. 89.)

## II.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022). Summary judgment is therefore appropriate only if the court determines that "no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990); *see also Anderson*, 477 U.S. at 250 (explaining that courts must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). When evaluating a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (citation omitted). The court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party, *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013), but it "cannot weigh the evidence or make credibility determinations," *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 959 (4th Cir. 2022) (quoting *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015)).

When exercising diversity jurisdiction, federal courts apply the substantive law of the forum state, including choice of law rules. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 226 (1991) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (observing that choice of law rules are substantive). Tort claims brought in Virginia are governed by the substantive law of the place of injury. *See Frye v. Commonwealth*, 345 S.E.2d 267, 272 (Va. 1986).

### III. Analysis

**A. Contributory Negligence**

In Virginia, "contributory negligence is a complete bar to recovery for injuries caused in part by the negligence of another." *Beach v. Costco Wholesale Corp.*, No. 5:18-cv-00092, 2020 WL 1879016, at *2 (W.D. Va. Apr. 15, 2020) (citing *Baker v. Butterworth*, 89 S.E. 849, 849–50 (Va. 1916)). Ordinarily, the existence of contributory negligence is a question for the jury. *Kelly v. Va. Elec. & Power Co.*, 381 S.E.2d 219, 222 (Va. 1989). However, "when persons of reasonable minds could not differ upon the conclusion that such negligence has been established, it is the duty of the trial court so to rule." *Id.* Defendants bear the burden of proving contributory negligence. *Ponirakis v. Choi*, 546 S.E.2d 707, 711 (Va. 2001).

The test for contributory negligence is "whether the plaintiff 'failed to act as a reasonable person would have acted for [her] own safety under the circumstances.'" *Hall v. DLC Mgmt. Corp.*, No. 7:11-cv-00298, 2013 WL 1743865, at *5 (W.D. Va. Apr. 23, 2013) (quoting *Artrip v. E.E. Berry Equip. Co.*, 397 S.E.2d 821, 824 (Va. 1990)). As a matter of law, "[a] person who trips and falls over an open and obvious condition or defect is guilty of contributory negligence." *Dale v. Va. CVS Pharmacy, LLC*, No. 7:19-cv-00578, 2021 WL 129820, at *3 (W.D. Va. Jan. 13, 2021) (quoting *Scott v. City of Lynchburg*, 399 S.E.2d 809, 810 (Va. 1991)). But contributory negligence may also be found where a condition is not open and obvious, for "[w]hen a plaintiff knows of the existence of the condition prior to being injured by it . . . whether a condition is open and obvious is not a jury issue and the plaintiff's conduct constitutes contributory negligence as a matter of law." *Mlincek v. CC2 Tree Tennant*

*Corp.*, 2005 WL 2035565, at *3 (E.D. Va. Aug. 22, 2005) (citing *Scott*, 399 S.E.2d at 811); *see, e.g.*, *Logan v. Boddie-Noell Enterprises, Inc.*, No. 4:11-cv-00008, 2012 WL 135284, at *10–11 (W.D. Va. Jan. 18, 2012) (finding that because the plaintiff "was aware" of the condition and failed to look out for it, she was contributorily negligent as a matter of law).

Defendants argue, and the evidence is not contradicted, that Frye knew of the step between the first-tier raised platform and the atrium floor. On September 26, 2023—the evening before her accident—Frye successfully navigated the step between the first-tier platform and the floor to reach the second-tier platform area.[2] (Def.'s Second Requests at 1–3; Potter Dep. at 57:14–59:2, 66:7–68:9; Forehand Dep. at 61:2–11, 64:11–65:2; Newman Dep. at 33:14–34:15.) After enjoying a drink with her friends, Frye successfully navigated the same step down from the first-tier platform to the atrium floor as the group prepared to leave the hotel for dinner. (Def.'s Second Requests at 1–3; Forehand Dep. at 80:8–81:21; Newman Dep. at 54:7–17.) The next morning, Frye navigated the step without incident as she sat down for breakfast, approximately an hour prior to her fall. (Frye Dep. at 188:6–190:9, 192:23–193:2, 202:5–9, 213:15–17; Forehand Dep. at 113:20–114:9.) Though Frye testified that she "was not thinking about" the visual difference between the two levels, she admits that she noticed the difference between the main floor and the platform floor, (Frye Dep. at 190:10–13), and that she "must have noticed it to negotiate [the step]," (*id.* at 192:9–16, 192:23–193:2).

---

[2] Frye first walked by the platform "[a]t least once" during her stay at the Omni in April 2023, five months before her accident. (Frye Dep. at 135:19–136:5.) However, passing by the platform does not necessarily mean that Frye knew about or became aware of the step between the atrium floor and the platform at that time.

Finally, Frye acknowledges that she was "made more aware" of the step the evening before her accident after seeing a woman who had fallen, as she suspected the step might have been the cause. (*Id.* at 218:12–219:10; *see* Potter Dep. at 76:17–77:2.) Frye was also seated alongside Potter when the latter warned Forehand to be mindful of the elevation change the same evening, although Frye did not confirm or deny that she heard this conversation. (Forehand Dep. at 69:11–70:9.) Lastly, Frye admitted that she was aware of the step when she stepped up to the platform area on September 27 and that she knew "at some point" she was going to have to step off the raised platform. (Frye Dep. at 219:6–10, 223:14–16). Frye said that she was probably looking "straight ahead" and that she was not looking for the edge of the platform when she tried to step off the platform. (*Id.* at 226:15–22, 238:4–5).

Defendants contend that this knowledge renders Frye contributorily negligent as a matter of law. (Defs.' Mem. at 16–21 (citing *Scott*, 399 S.E.2d at 809–11; *Hill v. City of Richmond*, 53 S.E.2d 810, 812–14 (Va. 1949).) Frye argues that this knowledge is insufficient to trigger contributory negligence as a matter of law, as the case law "involve[s] a level of familiarity with the dangerous condition simply not present here." (Pl.'s Resp. at 16 (Dkt. 88).) For example, in *Scott v. City of Lynchburg,* the plaintiff had known of the existence of the hazard since childhood and had observed it on at least ten occasions in the nine months leading up to her accident, while in *Hill v. City of Richmond*, the plaintiff had lived a block away from the hazard for six years. (*Id.* at 16–17.) By contrast, Frye had at most seen the platform in passing five months prior to her accident, had only stepped onto it once the evening before her accident and once an hour prior to her accident, and had only stepped off of it once the evening before

- 11 -

her accident. This, Frye contends, renders her case more like *Nuckoles v. F.W. Woolworth Co.*, where a shopper tripped over a box that was the same color as the store's floor and which might have been hidden behind a store employee "until [the] plaintiff was nearly upon it," providing the plaintiff with no advance notice of the hazard. 372 F.2d 286, 288 (4th Cir. 1967). There, the Fourth Circuit declined to find contributory negligence even though the plaintiff failed to "look down," finding that "[m]ost people do not bow their heads and look at their feet while shopping in a store, nor has the Supreme Court of Appeals of Virginia ever prescribed such a standard of care." *Id.* at 287. So too, Frye argues, "for a restaurant in a hotel lobby, where guests are encouraged to eat, drink and interact with other guests, companions and staff." (Pl.'s Resp. at 17.)

The court finds *Nuckoles* inapposite here, where Frye had prior knowledge of the hazard. And although Frye does not have the same yearslong familiarity with the hazard used to support constructive knowledge in *Scott* and *Hill*, she cites no case law stating that contributory negligence is dependent upon the duration of a plaintiff's knowledge. In fact, courts have found an injured person with knowledge of a dangerous condition to be contributorily negligent, even when such knowledge was formed shortly prior to the injury. *See e.g.*, *Arthur v. Crown Cent. Petroleum Corp.,* 866 F. Supp. 951, 954–55 (E.D. Va. 1994) (finding plaintiff contributorily negligent when she stepped up onto an elevated platform to pay a cashier and then fell when stepping back down, because she had actual knowledge of the step); *Mlincek*, 2005 WL 2035565, at *3 (finding plaintiff contributorily negligent when he navigated the curb at issue three times in the four days before his accident); *Harris v. United States*, No.

4:07-cv-00018, 2007 WL 4562875, at *4–5 (E.D. Va. Dec. 20, 2007) (finding plaintiff contributorily negligent when it was undisputed that she saw grapes on floor when approaching register but slipped after failing to look for them upon leaving a short time later).

Indeed, Frye is distinguishable from the plaintiffs in *Scott* and *Hill* because her knowledge of the hazard at issue was supported by three direct interactions within the twenty-four hours preceding her accident—unlike the plaintiff in *Scott*, who had only stepped over the curb at issue once in the several months prior to her fall, and the plaintiff in *Hill*, who regularly passed by the offending sidewalk depression but presented no evidence as to the frequency of those walks or his most recent navigation of the hole. Rather, Frye is most similar to the plaintiff in *Mlincek v. CC2 Tree Tennant Corp.*, who first traversed a step between a public sidewalk and a hotel sidewalk while traveling from his tour bus to the hotel upon his arrival. *Mlincek*, 2005 WL 2035565, at *1. The step was not marked with contrasting coloring or surfaces, and there was no handrail. *Id.* The next day, Mlincek traversed the same step while walking from the hotel to his tour bus, which was parked in the same location, and then again from the bus back to the hotel. *Id.* Two days later, Mlincek was walking the same route from the hotel to his tour bus when he missed the step between the hotel sidewalk and public sidewalk and fell. *Id.* At the time of his fall, Mlincek was looking ahead at the bus and not down at the step. *Id.* The court noted that, "[a]lthough it [could] be argued that Mr. Mlincek was not as familiar with the location of his accident as the plaintiff[] in . . . *Scott*, who had been there many times before [his] accident[], Mr. Mlincek traversed the route at least three times within the four days before the accident" and "navigated the curb with no difficulty on those

- 13 -

three prior occasions." *Id.* at *3. The court concluded that those instances sufficed to give Mlincek knowledge of the step, and that Mlincek's forgetfulness constituted contributory negligence. *Id.*

Here, Frye traversed the step three times in the twenty-four hours prior to her accident. One of those instances was only about an hour before her fall. Frye cannot (and does not) claim that she had no knowledge of the step. And Frye admits that, despite that knowledge, she did not take the reasonable precaution of looking down when stepping off the platform. (Frye Dep. at 219:6–10, 223:14–16, 226:15–22.) Accordingly, the court finds Frye contributorily negligent as a matter of law because she had knowledge of the step, yet failed to exercise reasonable care stepping off because she forgot the step was there. While the court is certainly sympathetic to Frye and the injuries she incurred, the law will not impose liability on a defendant for a plaintiff's own failure to exercise reasonable caution. Frye's contributory negligence must bar recovery and the court will grant Defendants' summary judgment motion as to Frye's claims of careless and gross negligence.

### B. Reckless Negligence

Frye next contends that Defendants were guilty of reckless negligence, "to which contributory negligence is not a defense." *Griffin v. Shively*, 315 S.E.2d 210, 212 (Va. 1984). Willful, wanton, or reckless negligence requires "acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Id.* at 213. "Willful and wanton negligence generally involves

- 14 -

some type of egregious conduct." *Canada v. Masri*, No. 3:21-cv-00655, 2021 WL 6196998, at *2 (E.D. Va. Dec. 30, 2021); *see Harris v. Harman*, 486 S.E.2d 99, 102 (Va. 1997) ("While each case must be resolved on its own facts, willful and wanton negligence generally involves some type of egregious conduct—conduct going beyond that which shocks fair-minded people."). Frye argues that "[D]efendants' ill-considered decision to omit the contrasting-colored edge from the renovated platform, coupled with [their] knowledge of the danger involved as demonstrated by the pre-and post-accident use of yellow and black warning tape gives the jury a basis to find reckless conduct." (Pl.'s Resp. at 18.)

This court disagrees. To begin, Defendants' placement of the safety tape following Frye's accident is evidence of a subsequent measure not admissible to prove negligence. *See* Fed. R. Evid. 407; *see also Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." (emphasis added)). And Defendants' use of safety tape prior to Frye's accident does not demonstrate knowledge of the dangerous or hazardous condition that Frye alleges. That is, Frye contends that the elevation change between platforms, coupled with the use of the same black tiles on both levels, constitutes a dangerous condition. (*See* Pl.'s Resp. at 17–18.) But Defendants' placement of the tape prior to her fall only demonstrates, if anything, Defendants' knowledge of the step as posing a potential hazard in the context of it being part of an active construction site.

The undisputed record shows that the placement of the black-and-yellow tape on the edge of the first-tier platform prior to Frye's accident was due to the platform area being "an active construction zone." (Rodriguez Dep. at 20:17–21:13, 41:10–14, 43:3–20.) Jose Rodriguez, who served as the project manager for the Omni atrium's renovation, (*id.* at 8:3–6), testified that the tape was placed "for safety reasons" during construction, including for the safety of construction workers and to prevent heavy construction equipment from damaging the edge of the platform, (*id.* at 64:12–65:1, 69:10–70:5). The tape was removed "because construction was completed" and the new, contrasting flooring installed. (*Id.* at 43:3–12, 70:6–9.) Taken on its own, the placement of the safety tape does not show that Defendants knew that the step itself, as finished post-renovation, constituted a potentially dangerous condition.

Nor does the other evidence in the record support a finding that Defendants were or should have been aware of the step's danger. Defendants provide testimony through their corporate representative that no one had ever complained of or reported any problem with the step between the atrium floor and the first-tier platform. (*See id.* at 15:13–22, 66:8–12.) Frye and Forehand testified that they did not complain about the step or otherwise report it to Defendants prior to Frye's fall, nor did they see anyone else report it. (Frye Dep. at 169:6–8, 256:2–10; Forehand Dep. at 91:6–8, 93:2–10, 93:16–94:2, 94:22–95:2.) And various employees and contractors of Defendants all testify to the same. (Jones Dep. at 24:18–21, 55:5–12, 56:5–12, 61:14–17, 69:7–11, 69:19–23; Smith Dep. at 23:17–25; Dowling Dep. at 16:3–13, 37:12–38:17; Dep. of Anthony Holland, Dec. 5, 2024, at 46:8–47:10, 51:13–17,

137:4–10 (Dkt. 87-7); Dep. of Sinisa Grbic, Dec. 5, 2024, at 10:21–11:6, 41:16–42:7, 42:18–21, 45:17–46:3 (Dkt. 87-12).)

Frye's friend Potter did testify that the evening before Frye's fall, one of the foursome mentioned to a bartender that the platform "should have a handle or . . . something." (Potter Dep. at 86:1–11.)  Potter also said that she told the bartender that he "need[ed] to do something about this."  (*Id.* at 86:9–14.)  Even when viewing the facts and drawing all reasonable inferences in favor of Frye, Potter's statement did not serve to put Defendants on notice that the step posed a danger.  Neither Potter nor her friends reported that a woman had fallen from the platform that evening, (*see id.* at 82:11–15, 160:14–17), and no reasonable juror could find that Potter's general statements about the step to a bartender conveyed to Defendants that the step posed a real risk to Frye or other guests.  The court therefore finds that Defendants did not have the requisite knowledge or awareness to have acted with reckless negligence with respect to the platform.

Moreover, Defendants provide evidence that Omni staff regularly inspected the atrium area, including the first-tier platform, (Jones Dep. at 55:16–24), and that all employees understood they had a duty to report any potentially dangerous or hazardous condition to Defendants, (*see, e.g., id.* at 67:11–15; Grbic Dep. at 46:7–11; Holland Dep. at 136:15–21).  Such actions demonstrate that Defendants clearly were not engaging in the kind of "egregious conduct" or conscious disregard for the safety of their guests that would be necessary to sustain Frye's claim of reckless negligence.

Accordingly, Defendants have satisfied their burden of demonstrating that there is no genuine issue of material fact, and the court will grant summary judgment on the issue of reckless negligence.

## IV. Conclusion

For the foregoing reasons, the court will grant Defendants' motion for summary judgment (Dkt. 86). Accordingly, the court will deny Frye's motion to exclude (Dkt. 59) and motion for judicial notice (Dkt. 63) as moot.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 19th day of September, 2025.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE